**D.C. APPLESEED CENTER FOR LAW AND JUSTICE, INC., Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF INSURANCE, SECURITIES, AND BANKING, Respondent,**

and

**Group Hospitalization and Medical Services, Inc., Intervenor.**

No. 10–AA–1461.

District of Columbia Court of Appeals.

Argued June 9, 2011.

Decided Sept. 13, 2012.

---

Walter A. Smith, Jr., with whom Richard B. Herzog, Marialuisa S. Gallozzi, Washington, and Kurt G. Calia, Redwood Shores, were on the brief, for petitioner.

E. Desmond Hogan, with whom Craig A. Hoover, Dominic F. Perella, and Michael D. Kass, Washington, were on the brief, for intervenor.

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Attorney General, and Richard S. Love, Senior Assistant Attorney General, filed a Statement in Lieu of Brief for respondent.

Mary M. Cheh, District of Columbia Councilmember, filed a brief as amicus curiae in support of petitioner.

Before FISHER and BLACKBURNE-RIGSBY, Associate Judges, and RUIZ, Senior Judge.*

RUIZ, Senior Judge:

Petitioner D.C. Appleseed Center for Law and Justice, Inc. (Appleseed) seeks our review of the decision and order of the respondent, District of Columbia Department of Insurance, Securities, and Banking (Department or DISB), determining that the 2008 surplus of intervenor, Group Hospitalization and Medical Services, Inc. (GHMSI), was not "excessive" for purposes of the Hospital and Medical Services Corporation Regulatory Act of 1996, as amended by the Medical Insurance Empowerment Amendment Act of 2008, D.C. Act 17–704, 56 D.C.Reg. 1346 (2009), D.C.Code §§ 31–3501 to –3524 (2009 & Supp.2010). Appleseed makes three principal arguments: (1) that the Commissioner incorrectly interpreted the relevant statutory language; (2) that the Commissioner failed to provide adequate reasons in support of the decision finding that the 2008 surplus was not excessive; and (3) that the Commissioner abused discretion in failing to order an immediate review of GHMSI's 2009 and 2010 surpluses. GHMSI opposes these arguments and, in addition, contends that Appleseed does not have standing to seek judicial review of the Commissioner's order. We conclude that Appleseed has standing to bring this petition. We also agree with Appleseed's first two contentions, but we reject the third. We therefore affirm the Commissioner's decision to defer review of GHMSI's 2009 and 2010 surpluses until July 31, 2012, but reverse the Commissioner's determination that GHMSI's 2008 surplus was not unreasonably large or excessive, and remand the matter to the Commissioner for further proceedings not inconsistent with this opinion.

## I. Factual and Procedural History

GHMSI was created in 1939 by Congressional charter to provide health care services and medical insurance.[1] *See* Pub.L. No. 76–395, 53 Stat. 1412 (1939).[2] Organized as a "charitable and benevolent institution," *id.* § 8, 53 Stat. at 1414, GHMSI "shall not be conducted for profit, but shall be conducted for the benefit of [its] certificate holders." *Id.* § 3, 53 Stat. at 1413. Although initially "not subject to the provisions of the statutes regulating the business of insurance in the District of Columbia," *id.* § 7, 53 Stat. 1414, Congress amended the charter in 1993 to place GHMSI under the District's regulatory authority as a result of GHMSI's "deteriorating" financial condition. *See* Pub.L. No. 103–127 § 138, 107 Stat. 1336, 1349 (1993).[3]

---

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on July 2, 2012.

1. GHMSI was originally incorporated as Group Hospitalization, Inc., but later merged with Medical Services, Inc., to form Group Hospitalization and Medical Services, Inc.

2. By the terms of its charter, GHMSI is authorized

 (a) to enter into contracts with individuals or groups of individuals to provide for hos-

pitalization of such individuals ...; (b) to enter into contracts with hospitals for the care and treatment of such individuals ...; and (c) to cooperate, consolidate, or contract with groups or organizations interested in promoting and safeguarding the public health.

*Id.* § 2, 53 Stat. at 1413.

3. *See also* S. COMM. ON GOV'T AFFAIRS, FOURTH INTERIM REPORT ON UNITED STATES GOVERNMENT EFFORTS TO COMBAT FRAUD AND ABUSE IN THE INSURANCE INDUSTRY: PROBLEMS IN BLUE CROSS/BLUE SHIELD PLANS IN WEST VIRGINIA, MARYLAND,

In 1997, GHMSI merged with Blue Cross/ Blue Shield of Maryland to form Care-First, Inc. *See Grp. Hosp. & Med. Servs., Inc.,* No. A–HC–97–01 (Dep't of Ins. & Sec. Regulation, Dec. 23, 1997). Presently, GHMSI enrolls about one million subscribers in the District of Columbia, Maryland, and northern Virginia; approximately 30% of its policies (individual, group and self-insured) are issued in the District and 10% of its individual subscribers reside in the District. According to the Commissioner, approximately 69% of premiums and claims during the 1999–2008 period were attributable to policies issued in the District of Columbia.

### A. *Appleseed's Report and Action by the Council of the District of Columbia*

In 2004, Appleseed issued a lengthy report, *CareFirst: Meeting Its Charitable Obligation to Citizens of the National Capital Area,* in which Appleseed concluded that "GHMSI has not been meeting [its] charitable obligation to citizens of the National Capital area" in violation of its "federally imposed charitable obligation." Asserting that "GHMSI is in effect owned by the public" and "[i]ts mission is to serve that public," the report argued that GHMSI was subject to regulatory oversight and that the D.C. Attorney General had authority to enforce its charitable mission. Appleseed urged GHMSI to engage in more charitable activities and at a higher rate. Specifically, the report recommended that GHMSI could spend "between 2 and 3 percent of its earned annual premiums [equaling $41 to $61 million] and still maintain its current pricing structure,

its level of competitiveness, and a high level of surplus."[4] The report also included a legal analysis prepared by Covington & Burling LLP arguing that GHMSI had an obligation, pursuant to its federal charter and District law, to support public health initiatives beyond providing health plans to its current subscribers.

Appleseed's report spurred activity by officials of the District of Columbia and by the Council of the District of Columbia. The following year, 2005, then-D.C. Attorney General Robert J. Spagnoletti issued a memorandum regarding GHMSI's charitable obligations. *See* Memorandum from Robert J. Spagnoletti, Attorney General, to Robert Bobb, City Administrator 8 (Mar. 4, 2005). The memorandum concurred with Appleseed's assessment that "GHMSI has an obligation to use its profits and excess surplus to serve the purpose of promoting health in its service areas," and agreed that the D.C. Attorney General has the authority to enforce GHMSI's obligations on behalf of the public. *Id.* at 8. Moreover, the D.C. Attorney General opined that GHMSI cannot fulfill its charitable mission "simply by allocating a specified percentage of premiums or earnings to distinctly 'charitable' activities. Rather, GHMSI is to devote its entire operations to serving, directly or indirectly, the purpose for which it was chartered." *Id.* at 2. The D.C. Attorney General's memorandum also concluded that it was up to GHMSI's Board to decide how it would do so, and that GHMSI could choose "to fulfill this obligation in various ways, such as devoting surplus resources to (1) improving the quality, benefits, affordability or accessibility of its non-profit health plans, (2) pro-

WASHINGTON, DC, NEW YORK, AND FEDERAL CONTRACTS, S.REP. NO. 104–92, at 45–57 (1995).

**4.** Appleseed's report followed on the heels of a regulatory decision in Maryland rejecting CareFirst's 2002 petition to convert to a for-

profit corporation because it would have set aside an inadequate amount for a public trust. Appleseed had opposed the conversion in the parallel D.C. proceeding before the DISB.

viding health plan benefits or other services to the poor at no charge, and/or (3) funding health-related activities that are conducted by other charitable organizations." *Id.* at 8. The D.C. Attorney General's Memorandum did not address whether GHMSI had "in fact been operating consistently with its charter." *Id.* at 2.[5]

That same year, also in response to Appleseed's report, the Commissioner made inquiry into the matter. *See* Report of the District of Columbia Department of Insurance, Securities, and Banking in the Matter of: Inquiry into the Charitable Obligations of GHMSI/CareFirst in the District of Columbia (May 15, 2005). After a public hearing in which Appleseed and its report were prominent, the Commissioner agreed that GHMSI has a legal obligation to engage in charitable activities and that "as a strong and responsible provider of health care insurance in its service area, [GHMSI] can and should do more to promote and safeguard public health of the residents of the District of Columbia." *Id.* at 2. The Commissioner concluded that, although by providing nonprofit health insurance GHMSI could meet its legal charitable obligations, GHMSI "can and should engage in more charitable activity" in the District, *id.* at 10, finding that it has the authority to do so in the area of public health, *id.* at 11–12, and that its ability "to do more for the community than it is doing currently is beyond doubt." *Id.* at 6–10. As a result, the Commissioner found that "GHMSI should be engaging in chari-

table activity significantly beyond its current activities," but rejected the level of charitable activity urged by Appleseed (between $41 and $61 million) as "unsound and potentially dangerous." *Id.* at 19. Because GHMSI testified that it proposed to reduce its surplus and engage in significant new health care initiatives in the District of Columbia, the Commissioner stopped short, however, of making a recommendation as to the proper level and nature of charitable activity that GHMSI should provide in the District, stating that it was for the GHMSI Board to make that determination in the first instance. *Id.* at 22.

## B. *The Medical Insurance Empowerment Amendment Act*

Dissatisfied with the state of affairs,[6] on January 23, 2009, the Council of the District of Columbia passed the Medical Insurance Empowerment Amendment Act of 2008 (MIEAA), D.C. Law 17–369, which authorizes the Commissioner to determine whether a medical services corporation's surplus is "excessive" and to order that any excess surplus be reinvested in the community. *See* D.C. Act 17–704, 56 D.C.Reg. 1346 (2009), D.C.Code §§ 31–3501 to –3524 (2009).[7] In particular, the MIEAA created a new section, entitled "community health reinvestment," which provides that "[a] corporation shall engage in community health reinvestment to the maximum feasible extent consistent with financial soundness and efficiency."

---

5. The Memorandum noted, however, several practices that would "contravene" GHMSI's charitable purposes, such as increasing profits or asset value without "due regard" for the effect on its health plans, paying executive compensation "substantially higher" than that paid by comparable non-profits, and providing benefits to subscribers that stray from GHMSI's public health mission.

6. In 2008, the District of Columbia sued GHMSI to enforce its legal obligation to operate as a charitable organization. The lawsuit was dismissed by consent upon enactment of the MIEAA.

7. For ease of reference, we refer to the codified sections of the law in the rest of the opinion, unless specific reference to a section of the Act is relevant to the discussion.

D.C.Code § 31–3505.01 (2009). The Act also added a new subsection to D.C.Code § 31–3506, which states in relevant part:

[T]he Commissioner shall review the portion of the surplus of the corporation that is attributable to the District and shall issue a determination as to whether the surplus is excessive. The surplus may be considered excessive only if:

(1) The surplus is greater than the appropriate risk-based capital requirements as determined by the Commissioner for the immediately preceding calendar year; and

(2) After a hearing, the Commissioner determines that the surplus is unreasonably large and inconsistent with the corporation's obligation under section 6(a).

D.C.Code § 31–3506(e) (2009).[8] The MIEAA became effective on March 25, 2009.

The Department published regulations pursuant to the MIEAA on November 13, 2009, establishing procedures for the determination of an excess surplus.[9] *See* 56 D.C.Reg. 8841 (2009). The regulations require all domestic hospital and medical services corporations licensed in the District to file an annual financial report with the Commission detailing "the company's surplus and examin[ing] whether the company's surplus is considered excessive." 26–A DCMR § 4601.1 (2009). If the Commissioner preliminarily determines that the company's surplus is excessive, the regulations compel a public hearing "to determine whether the company's surplus is excessive and unreasonably large." *Id.* § 4601.5.

As this appeal centers on the issue of GHMSI's surplus, we pause to provide some background information. GHMSI, like all insurance companies, is required to maintain a surplus of capital to cover the company's projected risk, development costs, and growth. The National Association of Insurance Commissioners (NAIC) has developed risk-based capital (RBC) formulas "as a standardized approach to developing minimum solvency indicators."[10] These formulas have been adopted by most states, the District of Columbia, and the Blue Cross/Blue Shield Association (BCBSA), of which GHMSI is an affiliate. The District of Columbia has adopted statutory minimum requirements for surplus levels, expressed as a RBC–ACL ratio. *See* D.C.Code §§ 31–2001 to – 2013. Regulatory action by the District is triggered when an insurer falls below 200% RBC–ACL ratio, at which point the insurer must submit a plan to the Department identifying the problematic conditions and proposing corrective actions. *See id.* §§ 31–2001(13), –2003. If an insurer falls below lower RBC–ACL levels, *i.e.* 150%, 100%, and 70%, increasingly corrective regulatory actions are taken by the

---

**8.** As initially enacted, this section mandated a surplus review every year. D.C. Act 17–704 § 2(d), 56 D.C.Reg. at 1347, D.C.Code § 31–3506(e) (2009). This section was subsequently amended to change the requirement of a mandatory annual review to a permissive annual review with a mandatory review once every three years. *See* D.C. Act 18–239 § 2(c), 56 D.C.Reg. 9182, 9184 (2009), D.C.Code § 31–3506(e) (Supp.2010).

**9.** A Notice of Emergency and Proposed Rulemaking was published in the *D.C. Register* on July 10, 2009. *See* 56 D.C.Reg. 5665 (2009).

**10.** The baseline figure in the RBC formula is the "authorized control level" (ACL), which is "an objectively calculated reference value" that accounts for the insurer's size, structure, and volume of risk. Against the baseline is measured the insurer's surplus, and the resulting ratio gives an indication of the insurer's security against insolvency, with a higher RBC–ACL ratio indicating a greater level of security.

Department. *See id.* §§ 31–2004, –2005, – 2006. In addition, the regulations obligate the Commissioner, in determining whether a surplus is excessive, to consider the RBC requirements of the NAIC and the capital requirements of the BCBSA.[11] 16–A DCMR § 4601.4; see note 34 *infra.*

### C. *GHMSI's Surplus Hearing*

The DISB Commissioner [12] preliminarily determined that GHMSI's surplus as of December 2008 was "greater than [the] appropriate risk-based capital requirements" and ordered a public hearing. On July 24, 2009, the Department published a notice of public hearing "to determine whether the portion of the surplus of [GHMSI] attributable to the District is unreasonably large and inconsistent with GHMSI's community health reinvestment obligations." *See* 56 D.C.Reg. 5967 (2009).

Before the hearing, GHMSI submitted two reports, each enclosing an analysis from Milliman, Inc., an actuarial firm, on GHMSI's surplus, as well as a report from The Lewin Group, another actuarial firm, analyzing both Milliman reports. Appleseed also submitted a report that included a legal analysis of the relevant provisions of the MIEAA, an assessment of GHMSI's surplus from a third actuarial firm, Actuarial Risk Management (ARM), and a statement from Deborah Chollet, a Senior Fellow at Mathematica Policy Research, Inc. At the hearing, conducted on September 10 and 11, 2009, the Commissioner [13] received oral and written testimony from GHMSI, Milliman, Lewin, ARM, the Commissioner of the Maryland Insurance Ad-

ministration (MIA), Appleseed, Senior Fellow Chollet, and other interested parties. The Commissioner also retained an actuarial firm, Rector & Associates, Inc. (Rector), to participate in the proceedings and to question witnesses. After the hearing, the Commissioner received supplemental reports and filings from GHMSI, Milliman, Lewin, and Appleseed, as well as additional submissions from interested members of the community. The Commissioner also received a report authored by the Invotex Group, an actuarial firm retained by the MIA for the proceedings against CareFirst in Maryland, and a report authored by Rector. The hearing record was closed on July 21, 2010.

### D. *DISB Commissioner's Decision and Order*

On August 6, 2010, the DISB Commissioner issued an initial decision and order. The Commissioner found that GHMSI's surplus level as of the end of 2008 was approximately $687 million and its RBC–ACL ratio was 845%.[14] In surveying the actuarial reports, the Commissioner noted that Milliman concluded that GHMSI's "optimal" surplus range was between 750–1050% RBC–ACL ratio; Lewin determined that an "appropriate" range was between 750–1000% RBC–ACL ratio; ARM determined that the appropriate range was between 400–525% RBC–ACL ratio; Invotex concluded that an "appropriate" range under Maryland law was between 700–900% RBC–ACL ratio; and Rector, the Commission's expert, did not

---

11. A BCBSA plan that falls below 375% RBC–ACL ratio triggers "early warning monitoring"; a plan that falls below 200% RBC–ACL ratio triggers a loss of the BCBS trademark.

12. The DISB Commissioner at the time of the preliminary determination was Thomas E. Hampton.

13. The DISB Commissioner at the time of the surplus hearing was Gennet Purcell.

14. The Commissioner also noted that GHMSI had RBC–ACL ratios of 951%, 893%, 955%, and 916% in the years 2004, 2005, 2006, and 2007, respectively.

provide a range, but estimated that a 600% RBC–ACL ratio would be required to not fall below a 200% RBC–ACL at a 99% confidence level, and 850% RBC–ACL ratio to not fall below 375% RBC–ACL ratio at a 95% confidence level. The Commissioner also found that in 2008, GHMSI paid approximately $7.1 million in premium taxes to the District of Columbia, contributed the equivalent of $3 million to the District's Open Enrollment program, and made contributions of approximately $2.9 million in the District for corporate health-related sponsorships, and various forms of targeted, programmatic, and catalytic giving. The Commissioner additionally took notice of the recently-enacted federal health care reform legislation ("Affordable Care Act"),[15] the impact of which would be "unprecedented, extremely significant, and . . . not fully known."

The Commissioner understood the term an "unreasonably large surplus," as defined in 26–A DCMR § 4699.4, to be "any amount in excess of RBC–ACL level that is necessary for the corporation to meet its expected and unanticipated contingencies, assuming the RBC–ACL level is at or above the NAIC and Blue Cross and Blue Shield Association RBC–ACL requirements." In comparing the four credited reports, the Commissioner found that "all four reports overlap substantially" in that "all four ranges determined by the experts include[d] . . . the RBC–ACL range of 750% to 850% as a subset."[16] However, the Commissioner deferred making a final determination, finding it necessary to obtain and consider information about how the Affordable Care Act would affect GHMSI. The Commissioner ordered the record to be reopened for that purpose.

Subsequently, in response to the Commissioner's order reopening the record, GHMSI submitted a supplemental report on September 3, 2010, which included estimates by Milliman and Lewin on the likely impact of the Affordable Care Act on GHMSI's future financial obligations and consequent need for an additional 100–200% RBC–ACL. Rector filed a report rebutting GHMSI's submission. Appleseed also submitted a supplemental report. GHMSI filed a submission rebutting Appleseed's and Rector's reports.

The Commissioner's final decision and order was issued on October 29, 2010. In the order, the Commissioner summarized the reports submitted by the parties and adhered to the findings of fact and credibility determinations set forth in the initial decision. The Commissioner first noted that the Affordable Care Act would "likely . . . require GHMSI to maintain additional surplus," but that the "precise financial impact" of the legislation was uncertain. With this consideration in mind, and "tak[ing] into account all expert reports and submissions accepted into the record," the Commissioner determined that GHMSI's surplus was not excessive. Specifically, the Commissioner found that while the experts disagreed on certain assumptions and calculations, they all agreed on using actuarial modeling methods to predict GHMSI's future capital needs. Further, the Commissioner observed that their findings had "significant overlap with regard to the surplus necessary for GHMSI's operations":

---

15. See Health Care and Education Reconciliation Act of 2010, Pub.L. No. 111–152, 124 Stat. 1029; Patient Protection and Affordable Care Act, Pub.L. No. 111–148, 124 Stat. 119 (2010).

16. The Commissioner discounted the ARM report submitted by Appleseed, finding that its methodology was "unclear" and that it lacked the necessary data "to perform a comprehensive and accurate analysis."

According to [Milliman]'s calculations, an "optimal surplus target range" for GHMSI as of December 31, 2008 is a 750–1050% RBC–ACL ratio. The other expert reports corroborate that maintaining an 850% RBC–ACL ratio would result in an extremely high degree of likelihood that GHMSI would not fall below a 200% RBC–ACL ratio as of December 31, 2008. Thus, all four experts—including the two experts engaged by GHMSI—agree that an 850% RBC–ACL ratio would give GHMSI an extremely high degree of likelihood of not dropping below a 200% RBC–ACL ratio as of December 31, 2008. The work performed by Milliman and the Commissioner's Experts also leads to the conclusion that an 850% RBC–ACL would provide a very high degree of likelihood that GHMSI would not drop below a 375% RBC–ACL ratio as of December 31, 2008. Further, the work performed by Lewin and Invotex Group does not contradict this conclusion.

The Commissioner declined to incorporate any increase to the RBC–ACL ratio to account for the new health care regulations because it found the increases suggested by GHMSI's experts, Milliman and Lewin, were "arbitrary and unsupported by actuarial data." The Commissioner stated that the "amount of surplus necessary for GHMSI to meet its expected and unanticipated contingencies as of December 31, 2008, is the surplus necessary to maintain an 850% RBC–ACL ratio." Therefore, because GHMSI's surplus as of December 31, 2008, yielded a 845% RBC–ACL ratio, the Commissioner concluded that it was "neither unreasonably large nor excessive." The Commissioner also determined that the portion of the surplus attributable to the District need not be calculated because it likewise was not excessive. The Commissioner further commented that GHMSI's surplus for 2009, $761 million, equated a 902% RBC–ACL ratio, which it would have deemed "unreasonably large . . . if all the assumptions underlying this review were to remain the same." Yet, finding a future review to be necessary due to changing assumptions caused by the new Affordable Care Act, the Commissioner felt it appropriate to make a de novo review of the surplus at a later date. The Commissioner thus ordered a subsequent review of GHMSI's surplus to occur "by July 31, 2012, with the benefit of the ongoing implementation of the Federal Health Care Reform Acts and the enactment and implementation of companion legislation in the District." [17]

Appleseed filed a petition for review of the Commissioner's order with this court on November 24, 2010. Appleseed then filed a consent motion to "confirm jurisdiction" of this court.[18] By order dated March 22, 2011, the motion was denied and the parties were directed to address the questions of the court's jurisdiction and Appleseed's standing in their briefs.

We address first the issues of jurisdiction and standing referred by the motions division and then turn to the merits of Appleseed's petition.

---

**17.** GHMSI's 2010 surplus was $969.5 million. *See Annual Statement for the Year Ending December 31, 2010 of the Condition and Affairs of the Group Hospitalization and Medical Services, Inc., DISB* (March 1, 2011), (http://disb.dc.gov/disr/frames.asp?doc=/disr/lib/disr/pdf/2010—annual_statements_health_entities/GHMSI—2010—annual.pdf). According to Appleseed, this surplus resulted in a RBC–ACL of approximately 1100%.

**18.** As a precaution, Appleseed also filed a petition for review in the Superior Court, which stayed the matter pending a decision of this court on jurisdiction.

## II. Jurisdiction

■ We conclude (and both parties agree) that we have jurisdiction to consider this petition for review under the District of Columbia Administrative Procedure Act (DCAPA). *See* D.C.Code § 2–510(a) ("Any person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Mayor or an agency in a contested case, is entitled to a judicial review thereof ... upon filing in the District of Columbia Court of Appeals a written petition for review."); *J.C. & Assocs. v. District of Columbia Bd. of Appeals & Review,* 778 A.2d 296, 301 (D.C. 2001) ("[D]irect appellate review of Mayoral or agency action in this court is available only for decisions in 'contested cases.'"). As the MIEAA requires a hearing prior to a surplus determination, *see* D.C.Code § 31–3506(e)(2); 26–A DCMR § 4601.5, and the hearing is adjudicatory in nature, *see Timus v. District of Columbia Dep't of Human Rights,* 633 A.2d 751, 756 (D.C.1993) (en banc), this is a "contested case" within the meaning of the DCAPA.[19] *See Powell v. District of Columbia Hous. Auth.,* 818 A.2d 188, 192–93 (D.C. 2003) (explaining that a "contested case" is a "controversy involving a 'trial-type' hearing that is required either by statute or by constitutional right," that "is an adjudicative, as opposed to a legislative, determination" (citing *Rones v. District of Columbia Dep't of Hous. & [Cmty.] Dev.,* 500 A.2d 998, 1000 (D.C.1985))). Appleseed's petition was properly filed in this court.

## III. Appleseed's Standing

Even though we have jurisdiction to hear the matter, before we consider the merits of Appleseed's petition for review, we must first determine whether Appleseed has standing to invoke our jurisdiction by bringing this petition. *See Grayson v. AT & T Corp.,* 15 A.3d 219, 229 (D.C.2011) (en banc) ("'Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims'" (quoting *Bochese v. Town of Ponce Inlet,* 405 F.3d 964, 974 (11th Cir.2005))). Appleseed argues that it has standing to petition for review of the Commissioner's order because it has suffered an injury in fact "as [a] GHMSI subscriber, a designated interested party and participant in the DISB proceedings, a District employer and purchaser of insurance, and an organization that dedicates extensive resources to improving health and quality of life for residents of the National Capital area." GHMSI asserts that Appleseed lacks standing as a GHMSI subscriber because any impact from the Commissioner's surplus determination on Appleseed's insurance premiums is too speculative, and that Appleseed lacks organizational standing because the Commissioner's decision, if allowed to stand, would not result in a sufficiently "concrete and demonstrable injury" to Appleseed's activities. We conclude that Appleseed has established both standing as a GHMSI subscriber and organizational standing.

### A. Legal Principles

■ Although Congress established the courts of the District of Columbia under Article I of the Constitution, we generally have adopted "'the 'constitutional' requirement of a 'case or controversy' and the 'prudential' prerequisites of standing'" applicable to the federal courts under Arti-

---

19. "The principal manifestation of a 'contested case' is its character as a quasi-judicial process based upon particular facts and information, and immediately affecting the interests of specific parties in the proceeding." *Timus,* 633 A.2d at 756 (quoting *Citizens Ass'n of Georgetown v. Washington,* 291 A.2d 699, 702 (D.C.1972)).

cle III. *Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1207 (D.C.2002) (quoting *Speyer v. Barry,* 588 A.2d 1147, 1160 (D.C.1991)). We therefore have followed "Supreme Court developments in constitutional standing jurisprudence with respect to 'whether the [petitioner] has made out a case or controversy between him[/her] and the [respondent] within the meaning of Article III.' " *Grayson,* 15 A.3d at 233–34 (second alteration in original) (quoting *Consumer Fed'n of Am. v. Upjohn Co.,* 346 A.2d 725, 727 (D.C.1975)).[20] In the case of standing analysis for claims arising under the DCAPA, we look to guidance from the Supreme Court's jurisprudence relating to standing under the federal APA. *See Basiliko v. District of Columbia,* 283 A.2d 816, 818 (D.C.1971) (adopting the three-pronged federal APA standing test enunciated in *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). Thus, to establish standing under the DCAPA to challenge an agency order, "the petitioner 'must allege (1) that the challenged action has caused [it] injury in fact, (2) that the interest sought to be protected ... is arguably within the zone of interests protected under the statute or constitutional guarantee in question [21] ... and (3) that no clear legislative intent to withhold judicial review is apparent.' " *Miller v. District of Columbia Bd. of Zoning Adjustment,* 948 A.2d 571, 574 (D.C.2008) (quoting *Dupont Circle Citizens Ass'n v. Barry,* 455 A.2d 417, 421 (D.C.1983)). The injury must be " 'an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) actual or imminent, not conjectural or hypothetical.' " *Friends of Tilden Park,* 806 A.2d at 1207 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In addition, "[t]o establish standing, a litigant must show 'a substantial probability that the requested relief would alleviate [its] asserted injury.' " *Miller,* 948 A.2d at 575 (quoting *In re Z.C.,* 813 A.2d 199, 202 (D.C.2002)).

### B. *Consumer and Subscriber Standing*

 As a general proposition, "[c]onsumers of regulated products and services have standing to protect the public interest

---

**20.** *See Grayson,* 15 A.3d at 233 (" 'Our jurisdiction thus extends as far as Congress has granted it [under Article I]. Without, however, examining the limits of this grant, this court has followed the principles of standing, justiciability and mootness to promote sound judicial economy and has recognized that an adversary system can best adjudicate real, not abstract, conflicts.' " (quoting *District of Columbia v. Walters,* 319 A.2d 332, 337 n. 13 (D.C.1974))). Yet, we have at times "diverge[d] from the Supreme Court's standing jurisprudence in certain limited circumstances." *Grayson,* 15 A.3d at 259–60 (Ruiz, J., concurring in part and dissenting in part).

**21.** With respect to this factor, in particular, we note that the federal APA and the DCAPA contain slightly different language on the scope of judicial review. *Compare* 5 U.S.C.A. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."), *with* D.C.Code § 2–510(a) ("Any person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Mayor or an agency in a contested case, is entitled to a judicial review thereof in accordance with this subchapter upon filing in the District of Columbia Court of Appeals a written petition for review."). The District's statute does not contain the limiting language that the party must be aggrieved "within the meaning of a relevant statute." In light of our conclusion, applying established standing principles grounded in Article III, that Appleseed does have standing to petition for review, we leave for another day whether the Article I origins of the D.C. courts should yield any significant distinction in the standing doctrine under the DCAPA.

in the proper administration of a regulatory system enacted for their benefit." *Envtl. Def. Fund, Inc. v. Hardin,* 428 F.2d 1093, 1097 (D.C.Cir.1970). In *Environmental Defense Fund,* several non-profit environmental protection organizations petitioned the Secretary of Agriculture to ban the use of DDT as a pesticide; the Secretary took some action as requested by the organizations, and the organizations brought suit to compel the Secretary to comply with their full request. *Id.* at 1095–96. In considering whether the organizations had standing to bring suit, the court described the injury as "the biological harm to man and to other living things resulting from the Secretary's failure to take action which would restrict the use of DDT in the environment." *Id.* at 1096. Noting that numerous studies and reports have found DDT to be harmful to plant and animal species, the court found that membership organizations that "had a demonstrated interest in protecting the environment from pesticide pollution," had standing as consumers of a regulated product, because "consumers, those who 'consume'—however unwillingly—the pesticide residues permitted by the Secretary to accumulate in the environment are persons 'aggrieved by agency action within the meaning of a relevant statute.'" *Id.* at 1097 (quoting the federal Administrative Procedure Act, 5 U.S.C. § 702 (Supp.V, 1969)).

Similarly here, Appleseed is a consumer of health insurance, a product regulated by federal and District law, and is a subscriber of GHMSI, a regulated insurer. According to the legislative history, the MIEAA was enacted to "ensure that nonprofit hospital and medical services corporations pursue their public health mission." D.C. Council, Report on Bill 17–934, the "Medical Insurance Empowerment Amendment Act of 2008," at 2 (Oct. 17, 2008). Therefore, consumers of health insurance, at a minimum, are intended beneficiaries of the MIEAA.[22] Clearly, then, Appleseed comes within the zone of interests protected by the MIEAA. *Cf. Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (explaining the "essential inquiry" of the zone of interests test "is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.'" (quoting *Block v. Cmty. Nutrition Inst.,* 467 U.S. 340, 347, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984) (alterations in original))). We recently addressed a similar issue in *Grayson,* where we considered whether two consumers' complaints alleged sufficient facts to confer standing to sue telecommunications companies and Internet service providers for violations of the District of Columbia Consumer Protection Procedures Act (CPPA). 15 A.3d at 223–24. We concluded that one consumer did not have Article III standing to bring suit because he sued on behalf of the "legal rights or interests of third parties" "in a wholly representative capacity." As he suffered no "distinct and palpable injury" personal to him, he was "in no different position … than any other unaffected citizen." *Id.* at 246–27. We came to a different conclusion with respect to the second consumer. *Id.* at 248–50. We

---

**22.** We say "at a minimum" because as discussed earlier, the MIEAA requires that companies "engage in community health reinvestment." D.C. Act 17–704 § 2(c), 56 D.C.Reg. at 1347, D.C.Code § 31–3505.01. The scope of that statutory mandate—whether the reinvestment of surplus may be restricted to consumers of health insurance and GHMSI subscribers or requires broader investment in public health—is not before us and we do not decide it. *See* D.C. Act 17–704 § 2(a), 56 D.C.Reg. 1346, D.C.Code § 31–3501(1A) ("'Community health reinvestment' means expenditures that promote and safeguard the public health or that benefit current or future subscribers, including premium reductions.").

explained that this consumer had alleged sufficient injury to establish standing insofar as the CPPA had created a statutory right for consumers to be free from improper trade practices. *Id.* at 248–49. Because the complaint alleged that the companies had failed to report and pay certain amounts to the Mayor, as required by law, we concluded that this consumer, who had purchased and used prepaid calling cards in the District, was injured by the allegedly unlawful business practice. *Id.* at 249–50.

■ Yet, even though Appleseed's status as a consumer and subscriber is necessary to have standing, Appleseed must also have suffered an injury caused by GHMSI's excess surplus that could be redressed by the Department in its surplus determination. *See Miller,* 948 A.2d at 575. To answer these questions, we turn to representations made by GHMSI during the surplus review proceedings. In its Pre–Hearing Report, GHMSI included a section entitled "Any Excess Reserves Should be Returned to Subscribers," which stated:

> We believe that any legitimate excess (which we do not believe exists) is the subscribers' money and should be returned to them. In effect, it means they were overcharged and are due a refund. In this case, since the portion "attributable" to the District was based on residency, any excess must be returned to the source from which it came or [to] which it is "attributed": D.C. residents who are subscribers. Returning any excess to subscribers is also consistent with the Congressional Charter of

GHMSI which commands GHMSI to serve for the "benefit of its subscribers." To do otherwise would violate the Congressional Charter.

Later, at the surplus hearing, GHMSI's CEO Chet Burrell testified to the same effect, stating: "If any legitimate excess is ever found on a different set of facts than those present here, it can mean only one thing: that subscribers were overcharged and are due a return of excess.... In such a circumstance, the only remedy the company can and would pursue is to do what its Charter commands: to return the excess to its subscribers." From these representations, it would appear that a determination that GHMSI's surplus was excessive would mean that Appleseed had been injured, because it was overcharged as a GHMSI subscriber.[23] With such a clear financial stake in the outcome of the surplus determination, Appleseed has shown that it suffered a concrete and actual injury resulting from the Commissioner's determination that GHMSI's surplus was not excessive. The fact that other GHMSI subscribers may be similarly situated does not detract from the basis for Appleseed's standing. *See Warth,* 422 U.S. at 501, 95 S.Ct. 2197 ("[T]he plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.").

■ GHMSI asserts that, even if Appleseed was injured by the Commissioner's determination, the Commissioner's ability to redress any injury to Appleseed caused by the excess surplus is speculative. GHMSI is certainly correct in that the statutory scheme does not require any re-

---

**23.** Appleseed submitted an affidavit executed by its office manager attesting that "[b]etween 2008–2009, D.C. Appleseed experienced a seventeen percent increase in the premiums paid for employees enrolled in GHMSI's BlueChoice; between 2009–2010, D.C. Appleseed experienced an eight percent increase in premiums paid for employees enrolled in GHMSI's BlueChoice; between 2010[-]2011, D.C. Appleseed experienced an additional six percent increase."

lief directed to Appleseed. The statute provides that after the Commissioner determines that an insurer's surplus is "excessive," "the Commissioner *shall* order the corporation to submit a plan for dedication of the excess to community health reinvestment in a fair and equitable manner." D.C. Act 17–704 § 2(d), 56 D.C.Reg. at 1347, D.C.Code § 31–3506(g)(1) (emphasis added). However, the plan "*may* consist entirely of expenditures for the benefit of current subscribers of the corporation." D.C. Act 17–704 § 2(d), 56 D.C.Reg. at 1347, D.C.Code § 31–3506(g)(2) (emphasis added). By its plain terms, then, the statute allows GHMSI (with the approval of the Commissioner, *see* 26–A DCMR § 4603.2) to decide how to reinvest the excess surplus, which may—or may not—benefit current subscribers. In other words, although the statute requires that the excess surplus be reinvested, and authorizes the insurer to reinvest the excess surplus for the benefit of its subscribers, it does not *require* the insurer to do so. *Cf. Baltimore v. District of Columbia,* 10 A.3d 1141, 1150 (D.C.2011) (concluding that a statutory scheme did not create an entitlement to benefits where the statute specified that the agency "may" perform certain enumerated actions).

To establish standing, however, Appleseed need not show a certainty that it will benefit directly under its proposed interpretation and implementation of the MIEAA. What Appleseed must show is "a substantial probability that the requested ruling would alleviate [Appleseed's] asserted injury." *Z.C.,* 813 A.2d at 202 (quoting *Lee v. District of Columbia Bd. of Appeals & Review,* 423 A.2d 210, 218 n. 12 (D.C. 1980)). As we have already noted, the statute provides that any excess surplus may be expended exclusively for the benefit of existing subscribers. But our analysis in this case does not end with the statute. Again, we look to the representa-

tions made by GHMSI to ascertain how any excess surplus would in fact be reinvested pursuant to the statute. During the surplus review proceedings, GHMSI's CEO stated that GHMSI would refund any excess surplus to its subscribers under the "command[ ]" of its congressional charter. Before us, GHMSI has refined its position, asserting during oral argument that although GHMSI would refund the excess surplus to its subscribers, any redress to Appleseed is nonetheless speculative because there is no guarantee as to which group of subscribers would receive the refunds. As GHMSI's counsel explained at oral argument:

> Appleseed is a small group employer and as you probably know there are individual markets—people who buy insurance individually—there's small groups—like small employers that buy insurance—and then there are large groups—big businesses. If the finding was an excess of surplus but the actuarial studies show that that surplus was generated by, for example, an overcharge in large group market, it very well could be that the plan submitted by the company would be rebates in the large group market, or if it was in the individual market—there was an overcharge in the individual market—it could be there would be a rebate in the individual market. At this point in time, it's entirely speculative to say what form any kind of relief, if any, Appleseed would be entitled to if a plan was submitted.

In a submission made after oral argument, Appleseed's counsel pointed to statements made by GHMSI CEO Burrell during the surplus hearing that quell any serious doubt as to whether a proposed refund would alleviate Appleseed's injury. Burrell testified that GHMSI's reserves "come directly from individuals and small

and medium group policy holders, and only from them. Large groups self-insure and typically contribute minimally to reserves." Later, in responding to a question about GHMSI's three principal lines of insurance, Burrell elaborated:

> The three principal lines that we have are all health lines.... They are the small and individual, small groups and individuals on which we take 100 percent risk, *and by the way, that's where the bulk of this comes from, the reserve, to serve them, from them.* The second is administrative services only contracts with large employers who themselves take the risk but hire us to do the servicing.... And then there's FEP, the federal employee program, on which that's a risk premium, but they largely hold their own reserves, and the opportunity in FEP is largely on how well we service that contract.

(Emphasis added.). Further, when asked directly whether "any excess surplus should be attributable to individuals or small groups," Burrell responded: "If there is an excess it goes back to them."

GHMSI filed a response to Appleseed's post-argument submission, arguing that "medium-size employers in the large group market contribute to surplus and thus might (or might not) benefit—depending on the results of a fact-bound analysis of the market segments where "excess" surplus was created" and that "it is not known *which* categories of subscribers insured by GHMSI would be entitled to refunds if excess was found."

Taken as a whole, these representations indicate to us that whether or not medium-size employers might also benefit from a refund, there is more than " 'a substantial probability that the requested relief would alleviate [Appleseed's] asserted injury' " insofar as an excess surplus reflects (as Burrell stated) that it was overcharged for its insurance coverage as a small group employer. *See Miller,* 948 A.2d at 575 (quoting *Z.C.,* 813 A.2d at 202). As evident from GHMSI's representations to the Commissioner and this court, any excess surplus would be refunded primarily to subscribers who are individual members and small group (and perhaps also medium-size) employers, because they are the ones who have contributed the "bulk" of the surplus. Thus, in light of these facts of record, a determination by the Commissioner that GHMSI carried an excessive surplus would redress Appleseed's injury—that is, its overpayment of insurance premiums [24]—by prompting GHMSI to submit a plan that would return the excess surplus to subscribers such as Appleseed. We therefore conclude that Appleseed has standing to bring this petition for review as a subscriber of GHMSI insurance likely to benefit from a determination that GHMSI's surplus is excessive.

### C. *Other Basis for Standing*

Appleseed contends that it also has standing as an organization whose mission and activities are dedicated to enhancing access to improved healthcare in the District of Columbia. This claim of standing is based on an injury to Appleseed that also would entitle it to sue on its own behalf, separate from its claim of standing based on injury to Appleseed as a GHMSI subscriber. As discussed, standing analysis can turn on the type of injury claimed, for example, in determining whether court intervention is likely to redress the injury. *See A.N.S.W.E.R. Coal. v. Kempthorne,* 493 F.Supp.2d 34, 44–47 (D.D.C.2007)

---

**24.** Because we conclude that Appleseed has standing as a GHMSI subscriber, we do not decide whether it also would have standing as a consumer of health insurance in the District of Columbia even if it did not purchase its insurance from GHMSI.

(holding that organization had standing to sue and request different types of relief on its own behalf and as representative of its members). Courts often address more than one basis for standing. *See, e.g., Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C.Cir.2011) (noting that non-profit organization "can assert standing on its own behalf, on behalf of its members or both"); *see also* 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3531.9.5 Rights Of Others— Organization Standing (3d ed.2011) (citing cases where standing upheld on different grounds).

■ Here there is an additional reason why it is necessary to address the two bases for Appleseed's standing. In considering a claim of standing, the court must assume the merits of the underlying claim. *See City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C.Cir.2003) (noting that "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims" (citing *Warth*, 422 U.S. at 502, 95 S.Ct. 2197)). The facts on which a party bases its claim to standing, however, are evaluated depending on the stage of litigation. *See Am. Soc'y for the Prevention of Cruelty to Animals v. Feld*, 659 F.3d 13, 19 (D.C.Cir.2011) ("Because the elements of standing are not 'mere pleading requirements but rather an indispensable part of the plaintiff's case,' plaintiffs must support each element of Article III standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" (quoting *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130)). In this case, the question of Article III injury-in-fact standing was never an issue before the Commission, see note 27 *infra*, and was

first raised in response to Appleseed's petition for review before this court. As a result, there has been no fact-finding focused on the factors relevant to standing analysis. It is possible, however, that as the case develops on remand, new evidence could come to light (perhaps as the impact of the Affordable Care Act is better understood) indicating that Appleseed's insurance premiums would not be affected by the Commissioner's determination concerning GHMSI's surplus. Moreover, GHMSI has made representations during oral argument and in post-argument submissions (discussed *supra*) that cast some doubt or narrow certain assertions it made during the surplus hearing that Appleseed uses to support its claim of standing as a subscriber of GHMSI health insurance. If the anticipated impact of the Commissioner's determination on Appleseed's insurance premiums changes as a result of further factual development and findings, Appleseed might no longer have standing as a subscriber. That happenstance, however, would not deprive Appleseed of its ability to continue with the litigation challenging the Commissioner's interpretation and implementation of the MIEAA in making an excess surplus determination if Appleseed nonetheless has standing as an organization. We therefore consider Appleseed's claim to standing as an organization and conclude, based on facts in the record to date (which appear to be uncontested), that Appleseed has organizational standing to challenge the Commissioner's surplus determination.

### D. *Organizational Standing*

■ An organization, such as Appleseed, may bring a petition for review as an entity in its own right under the DCAPA so long as it satisfies the constitutional requirements and prudential prerequi-

sites[25] of traditional standing analysis.[26] The fundamental question of an organization's standing is the same as with an individual: whether the organization has "'alleged such a personal stake in the outcome of the controversy' (as) to warrant" court intervention. *Arlington Heights v. Metro. Hous.· Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). A "mere 'interest in a problem,'" however, is insufficient. *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *see also Miller*, 948 A.2d at 574 (noting that to show injury in fact, an organization "must assert more than a generalized grievance"). This does not mean that in the case of nonprofit organizations, whose mission frequently is directed to an issue of public interest or welfare, standing is defeated because the organization's activities are motivated by an interest in pursuing its overall mission. Rather, the question of standing turns on whether the organization's activities in pursuit of that mission have been affected in a sufficiently specific manner as to warrant judicial intervention. Thus, a nonprofit developer, whose mission was to make "suitable low-cost housing available in areas where such housing is scarce," *Arlington Heights*, 429 U.S. at 263, 97 S.Ct. 555, had standing to challenge the refusal of re-zoning to permit construction of low-cost housing even if the developer had no economic interest in making money from the project. The fact that a "specific project" was at stake, "whether or not it will generate profits," provided the "'essential dimension of specificity' that informs judicial decisionmaking.'" *Id.* (quoting *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 221, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)); *cf. Warth*, 422 U.S. at 508–09, 512, 95 S.Ct. 2197 (denying standing to nonprofit concerned about lack of adequate low-income housing where sole injury claimed to itself as taxpayer was "conjectural").

The Supreme Court has recognized that a nonprofit organization has standing when other types of activities—less tangible than building a housing development—have been "perceptibly impaired" by the challenged action. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In *Havens*, the Court considered whether an entity known as Housing Opportunities Made Equal (HOME)—"a nonprofit corporation ... whose purpose was to make equal opportunity in housing a reality in the Richmond Metropolitan Area" and whose activities "included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination," *id.* at 368, 102 S.Ct. 1114—had organizational standing to sue under the Fair Housing Act. *Id.* at 378–79, 102 S.Ct. 1114. The Court explained that a "concrete and demonstrable injury to the

---

**25.** Prudential requirements, over and above constitutional "injury in fact," derive from the statute under which the claim arises. *See Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). In this case, where the DCAPA provides judicial review to "any person" who has "suffer[ed] a legal wrong" or is "adversely affected or aggrieved" as a result of an "order or decision" of an agency, D.C.Code § 2–510(a), we perceive no need for additional prudential limitations based on the statute. See note 19 *supra*. GHMSI has not suggested otherwise.

**26.** An organization may also have standing to sue on behalf of its members, provided its members themselves have standing. *See Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). That basis for representational standing is not presented in this case.

organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests," and thus suffices as an Article III injury in fact. *Id.* at 379, 102 S.Ct. 1114. Because the alleged discriminatory steering practices impaired HOME's *ability*—and not only its abstract social interest—to carry out its activities in furtherance of the goal of equal housing, the Court concluded that HOME had organizational standing to sue in its own right. *Id.*

We applied the *Havens* principles on organizational standing in *Friends of Tilden Park,* 806 A.2d at 1201. There, we addressed whether Friends of Tilden Park, Inc. (Friends), a nonprofit organization "interested in the development and preservation of the North Cleveland Park neighborhood," had standing to enjoin the construction of an apartment building in that neighborhood. *Id.* at 1203–04. Friends alleged two bases for its organizational standing: "procedural" injury and "informational" injury, both allegedly caused by the District's decision not to require an environmental impact study (EIS) before construction was approved. *Id.* at 1204–05. In first considering the alleged procedural injury caused by the District's failure to require an EIS, we assumed that the failure to conduct an EIS deprived Friends of a procedural right, but we ultimately determined that, by itself, "the loss of an entitlement to participate in agency evaluation of an EIS does not constitute sufficient 'injury in fact' to support standing to sue" because the deprivation did not concretely affect Friends, *id.* at 1212, which had not alleged that the proposed construction would affect its "institutional use or enjoyment of the environment around the building site." *Id.* at 1210. In addition, we rejected Friends' claim based on violation of its right to access and dis-

seminate information about the environmental impact of the construction because Friends could not articulate any "concrete ways in which its programmatic activities had been harmed by the District's failure to order an EIS." *Id.* at 1213. Specifically, we held that " '[t]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient' " to render the organization "adversely affected" or "aggrieved" for standing purposes. *Id.* at 1207 (quoting *Nat'l Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1434 (D.C.Cir.1995)). Because Friends could not allege a sufficient injury in fact to its activities, we vacated the order of the trial court and remanded with directions to dismiss Friends' complaint for lack of standing as an organization. *Id.*

While these cases are instructive, none is controlling with regard to the circumstances presented here. Certainly, if Appleseed's activities included the provision of direct health care services in the area served by GHMSI and Appleseed claimed that the Commissioner's determination impaired its ability to provide these services, we would have no difficulty finding an injury in fact sufficient to confer organizational standing. *Cf. Havens Realty Corp.,* 455 U.S. at 379, 102 S.Ct. 1114. Likewise, if as GHMSI contends, Appleseed were merely alleging a hindrance to its interest in good governance in the District, by promoting the public policy of the MIEAA, we would have little trouble concluding that the injury was too generalized a grievance to confer standing under the DCAPA. *Cf. Friends of Tilden Park,* 806 A.2d at 1207. Instead, the injury Appleseed claims is not interference with an operational function like providing health care, yet it extends well beyond a mere frustration of Appleseed's abstract interests. The injury,

more precisely, is caused by the agency's very interpretation and implementation of a statutory scheme—the MIEAA—that was sparked by Appleseed's 2004 investigation of and report on GHMSI's practices, that Appleseed helped craft and promoted before the Council of the District of Columbia, and whose proper implementation it has pursued in an administrative proceeding before the Department in which Appleseed fully participated as an "interested member of the public." [27] The injury to Appleseed's activities, properly understood, is that, in the view of Appleseed, the Commissioner's order erroneously interpreting and applying the MIEAA would undo the dogged and concrete work that Appleseed has undertaken over a number of years to establish and enforce the legal structure created by the MIEAA so as to enhance the availability of affordable health care and promote public health in the District of Columbia. If the Commissioner's order is allowed to stand, Appleseed argues, it will be forced to "devote significant additional resources to advocate on behalf of the District's growing population of low-income residents facing significant unmet healthcare needs." In this respect, the injury to Appleseed is much more specific than that alleged in *Friends of Tilden Park,* where the organization's interest in an EIS was purely abstract and *no* injury to its activities, or even impaired enjoyment of the area, were alleged, 806 A.2d at 1212–13, and more closely resembles the injury in *Havens Realty Corp.,* where the organization suffered a concrete interference with its counseling activities in furtherance of fair housing opportunities in the Richmond area. *See Havens Realty Corp.,* 455 U.S. at 378–79, 102 S.Ct. 1114. In light of its long and dedicated pursuits of the benefits to improved access to health care in the District of Columbia that would flow from greater community investment by GHMSI, Appleseed has shown that faulty interpretation and implementation of the MIEAA would inflict "concrete and demonstrable injury" to its activities.[28] *Id.* at 379, 102 S.Ct. 1114; *see Fair Emp't Council of Greater Washington, Inc. v. BMC Marketing Corp.,* 28 F.3d 1268, 1276 (D.C.Cir.1994) (holding that, as in *Havens,* the challenged discriminatory employment referral practices "perceptibly impaired" the Fair Employment Council's promotion of equal employment opportunity through, among other activities, "community out-

**27.** Appleseed has been a long-time participant in DISB proceedings involving GHMSI. At the 2002 D.C. DISB hearing on whether Care-First could convert to a for-profit corporation, the Commissioner found that Appleseed had full participation rights as a party, pursuant to the Hospital and Medical Services Corporation Regulatory Act of 1996 and the Holding Company Systems Act of 1993. *See* DISB, *In Re: Application of Wellpoint Health Networks Inc. Regarding Conversion and Acquisition of Control of Group Hospitalization and Medical Services, Inc.* (Aug. 9, 2002). After the MIEAA was adopted, on March 25, 2009, all domestic hospital and medical services corporations licensed in the District are required to file an annual financial report regarding the company's annual surplus. *See* 26–A DCMR § 4601.1 (2009). Once the Commissioner decided to hold a hearing to examine GHMSI's 2008 surplus, "the corporation and members of the public may submit a written report for consideration by the Commissioner," and "at the discretion of the Commissioner, interested members of the public may make oral presentations." 26–A DCMR §§ 4602.2, 4602.3(c). Appleseed filed a report with the Commissioner and was permitted to present testimony at the surplus hearing.

**28.** That Appleseed's mission more broadly encompasses "systemic reform of D.C. governance and fostering an improved quality of life in the Washington metropolitan area," does not detract from the fact that, with respect to GHMSI's surplus and charitable activities, Appleseed has a specific interest in proper and vigorous enforcement of the requirements it helped to fashion in the MIEAA.

reach, public education, counseling, and research projects," such that "there can be no question that the organization has suffered injury in fact").

Our characterization of Appleseed's injury aligns with the decision in *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, in which the D.C. Circuit considered whether a public interest group had standing to enjoin the Food and Drug Administration (FDA) from preventing the sale of certain drugs to terminally ill patients. 469 F.3d 129, 131–32 (D.C.Cir.2006).[29] The court noted that standing requires, at a minimum, "that the litigant has suffered a concrete and particularized injury that is actual or imminent, traceable to the challenged act, and redressable by the court." 469 F.3d at 132. In determining whether the Alliance had standing on its own behalf, the court explained that it had "distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised." *Id.* at 133. Because the Alliance's complaint alleged that its activities of "counseling, referral, advocacy, and educational services" had been injured by the FDA's policies, the court found that the Alliance had standing in its own right. *Id.*[30] The court reiterated, however, that public interest organizations do not have standing merely based on their challenge to regulations and agency actions they dislike; rather, "[f]or standing to be based upon an injury to the organization's activities there must be a direct conflict between the defendant's conduct and the organization's mission." *Id.*

The D.C. Circuit recently reiterated that it has applied *Havens* " 'to justify organizational standing in a wide range of circumstances.' " *Am. Soc'y for the Prevention of Cruelty to Animals*, 659 F.3d at 25 (quoting *Abigail Alliance*, 469 F.3d at 133). It noted that, in addition to the requirement that the organization's activities be impaired, there are "two important limitations on the scope of standing under *Havens.*" *Id.* First, there must be a " 'direct conflict between the defendant's conduct and the organization's *mission.*' " *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C.Cir.1996)). Otherwise, if the impact is "neutral" with respect to the organization's substantive mission, it would be " 'entirely speculative' " whether any infringement "will actually impair the organization's activities." *Id.* Second, the organization may not " 'manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.' " *Id.* (quoting *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990)).

In this case, these two additional conditions are satisfied. There can be no question that the Commissioner's order permitting GHMSI to maintain a surplus that Appleseed believes is fiscally unnecessary and contrary to GHMSI's charitable obligations is in direct conflict with Appleseed's core mission to improve the quality of life for residents of the D.C. metropolitan area, see note 28 *supra,* which, as we have discussed, has found specific expres-

**29.** *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 535 n. 14, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) ("Since the vast majority of challenges to administrative agency action are brought to the Court of Appeals for the District of Columbia Circuit, the decision of that court ... will serve as precedent for many more proceedings for judicial review of agency actions than would the decision of another Court of Appeals.").

**30.** The court held that the Alliance also had standing to sue on behalf of its members. 469 F.3d at 133–36.

sion in efforts to improve access to health care for D.C. residents. And, in claiming injury, Appleseed does not rely solely on its efforts and expenses in this particular lawsuit, but on its long and sustained dedication of resources, beginning with its 2004 investigation and report, public education, and legislative advocacy,[31] to create, implement, and enforce a statutory framework to hold GHMSI to account for its charitable obligation to District of Columbia residents. This appeal comes at the end of Appleseed's protracted pursuit of greater investment by GHMSI in accessible health care for D.C. residents.

In concluding that Appleseed has suffered an injury in fact sufficient to establish organizational standing, we do not set the standing threshold so low that any organizational plaintiff "would be able to surmount it." *Friends of Tilden Park,* 806 A.2d at 1213. Appleseed is not just one of any number of organizations with an interest in enforcement of the MIEAA. The Commissioner's decision that GHMSI's surplus is not excessive is in direct conflict with Appleseed's activities in pursuit of its organizational mission. Although Appleseed does not itself provide medical counseling or treatment, its activities have a direct impact on the ability of District residents to access those services. Since 2004, Appleseed has conducted research and issued reports specific to the issue of GHMSI's surplus involved in the underlying proceeding, similar to the Fair Employment Council of Greater Washington's "community outreach and public education, counseling and research projects" dedicated to promoting equal opportunities in employment, *see* 28 F.3d at 1276; and Appleseed

has promoted District residents' access to better health care by persistently advocating that a greater share of GHMSI's surplus be invested in enhanced services and lower premiums in the District of Columbia, as did the Abigail Alliance for Better Access to Developmental Drugs with respect to the FDA requirements for experimental drug treatments it challenged as too onerous. *See* 469 F.3d at 132–133. Appleseed does not merely seek to enforce the requirements of the MIEAA, but has been a catalyst for and helped to create those requirements. If, as Appleseed asserts, the Commissioner has misinterpreted the law, the Commissioner's flawed determination concerning GHMSI's surplus would "have reduced the effectiveness" of Appleseed's efforts. *Fair Emp't Council,* 28 F.3d at 1276. In this respect, we see little difference between an organization that has a brick-and-mortar clinic providing health care and Appleseed's active participation in constructing the legal edifice that forms the foundation for enhanced access to such services. As the remaining elements of the standing analysis—" 'that the interest sought to be protected ... is arguably within the zone of interests protected under the statute or constitutional guarantee in question ... and [ ] that no clear legislative intent to withhold judicial review is apparent,' " *Miller,* 948 A.2d at 574 (quoting *Dupont Circle Citizens Ass'n v. Barry,* 455 A.2d 417, 421 (D.C.1982))— are amply met here, we conclude that Appleseed is an "aggrieved party" under the DCAPA and therefore has organizational standing to bring this petition for re-

---

**31.** Although the D.C. Circuit has not decided whether injury to an organization's advocacy alone suffices to establish standing, it has noted that "many of our cases finding *Havens* standing involved activities that could just as easily be characterized as advocacy—and, indeed, sometimes are." *Am. Soc'y for the Prevention of Cruelty to Animals,* 659 F.3d at 27 (citing cases).

view.[32]

## IV. Interpretation of the Medical Insurance Empowerment Amendment Act (MIEAA)

■■ Having determined that Appleseed has standing to petition for review of the Commissioner's order, we turn to the merits of Appleseed's petition. Appleseed argues that the Commissioner's interpretation of the MIEAA was flawed in that the Commissioner failed to construe the statute as a whole, including the requirement that GHMSI engage in community health reinvestment to the "maximum feasible extent." D.C.Code § 31–3505.01. GHMSI responds that the Commissioner's interpretation of the statute was reasonable (and, in fact, correct) because the statute plainly establishes two distinct steps for a determination of an excessive surplus.

### A. Standard of Review

"In reviewing an agency interpretation of a statute, this court follows the two-part test set out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council.*" *Pannell–Pringle v. District of Columbia Dep't of Emp't Servs.*, 806 A.2d 209, 211 (D.C.2002) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). We must first determine whether the meaning of the statute is clear and, if so, we " 'must give effect to the unambiguously expressed intent of [the legislature].' " *Colbert v. District of Columbia Dep't of Emp't Servs.*, 933 A.2d 817, 819 (D.C.2007) (alteration in original) (quoting *Timus*, 633 A.2d at 758). If the statute is ambiguous, we will defer to an agency's reasonable interpretation of the statute it administers. *See Coumaris v. District of Columbia Alcoholic Beverage Control Bd.*, 660 A.2d 896, 899 (D.C.1995). In such a case, " '[t]he agency's interpretation ... is controlling unless it is plainly erroneous or inconsistent with the statute.' " *In re D.K.*, 26 A.3d 731, 734 (D.C. 2011) (quoting *Taggart–Wilson v. District of Columbia*, 675 A.2d 28, 29 (D.C.1996) (quotation marks omitted)). However, "[n]o deference is appropriate ... where the agency has failed to identify the question of statutory construction to be addressed." *Coumaris*, 660 A.2d at 899. Likewise, "[w]e will not affirm an administrative determination that 'reflects a misconception of the relevant law or a faulty application of the law.' " *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 992 A.2d 1276, 1280 (D.C.2010) (quoting *Georgetown Univ. v. District of Columbia Dep't of Emp't Servs.*, 971 A.2d 909, 915 (D.C. 2009)).

### B. The Commissioner's Interpretation

We begin by noting that the Commissioner never expressly interpreted the

---

**32.** We are unpersuaded by GHMSI's reliance on *Mallof v. Bd. of Elections & Ethics*, 1 A.3d 383 (D.C.2010). *Mallof* did not involve organizational standing but individual complainants who claimed standing as voters to challenge an agency's allegedly faulty implementation of campaign laws. We held that the voters, who alleged that the agency's determination that a candidate's advertisement did not violate campaign laws had injured them "by diminishing their ability as voters to affect the outcome" of the election, *id.* at 394, did not have standing because "the purported diminishment of petitioners' effectiveness as voters as a result of the [candidate's] campaign's advertisement" was neither concrete nor sufficiently particularized to qualify as an injury in fact. *Id.* at 398. We noted that petitioners were not impeded in their activities as voters in support of their preferred candidate, or against the candidate they alleged had violated the law. Indeed, the challenged advertisement was withdrawn upon the claimant's filing with the agency, a fact that called into question whether there was any relief the court could grant. *Id.*

MIEAA in either the initial decision or the final order. Nonetheless, an interpretation is implicit in the Commissioner's application of the statute. Section 2(d) of the MIEAA provides as follows:

[T]he Commissioner shall review the portion of the surplus of the corporation that is attributable to the District and shall issue a determination as to whether the surplus is excessive. The surplus may be considered excessive only if:

(1) The surplus is greater than the appropriate risk-based capital requirements as determined by the Commissioner for the immediately preceding calendar year; and

(2) After a hearing, the Commissioner determines that the surplus is unreasonably large and inconsistent with the corporation's obligation under section 6(a).[33]

D.C. Act 17–704 § 2(d), 56 D.C.Reg. at 1347, D.C.Code § 31–3506(e). In turn, section 6(a) states that "[a] corporation shall engage in community health reinvestment to the maximum feasible extent consistent with financial soundness and efficiency." D.C. Act 17–704 § 2(c), 56 D.C.Reg. at 1347, D.C.Code § 31–3505.01. In applying the statute, the Commissioner's analysis focused exclusively on determining whether GHMSI's surplus was "unreasonably large" based on actuarial studies and made no determination as to whether the size of the surplus was "inconsistent with the corporation's obligation under section 6(a)." This approach is based on the Commissioner's understanding of the statutory scheme as providing that "GHMSI's surplus may only be 'excessive' if the Commissioner determines that the surplus is 'unreasonably large.'" A similar approach is apparent in the Commission's regulations under the MIEAA, which were promulgated on November 13, 2009, after the surplus hearing but prior to the Commissioner's decision. In defining "excessive" surplus, the regulations contain no consideration or even mention of the "maximum feasible extent" language, but include a definition of "unreasonably large" that refers exclusively to capital requirements determined in relation to the preceding year's surplus and future contingencies. See 26–A DCMR § 4699.4.[34] In short, it is apparent that the Commissioner interpreted the MIEAA to require a two-step determination whereby there is, first, a determination whether GHMSI's surplus was "unreasonably large," and, second, a separate determination whether the surplus, if determined to be unreasonably large, was consistent with GHMSI's community health reinvestment obligation.[35]

---

**33.** In the codification of Section 2(d) of the MIEAA, the reference to section 6(a) is misidentified as § 31–3505(a). *See* D.C. Act 17–704 § 2(d), 56 D.C.Reg. at 1347, D.C.Code § 31–3506(e)(2). The appropriate reference should be to § 31–3505.01, which sets forth the "maximum feasible extent" requirement for community health reinvestment contained in section 6(a) of the MIEAA. D.C. Act 17–704 § 2(c), 56 D.C.Reg. at 1347, D.C.Code § 31–3505.01.

**34.** The regulations define an "unreasonably large surplus" as:

[A] surplus of a corporation that is greater than the sum of the following:

(a) The appropriate NAIC risk-based capital level requirements determined by the Commissioner and the Blue Cross/Blue Shield Association capital requirements based on the company's surplus from the immediately preceding year; and

(b) The amount of surplus needed by the corporation to meet its expected and unanticipated contingencies.

*Id.* § 4699.4.

**35.** Our understanding of the Commissioner's implicit interpretation is supported by a statement of the deputy commissioner made during the surplus hearing, in which he voiced the interpretative intent of the Department: "If we do not determine [that GHMSI] had

## C. *Analysis*

Even though we can infer how the Commissioner interpreted the statute, we afford it little deference insofar as the interpretation is unexplained. *See Coumaris,* 660 A.2d at 899. Thus, we employ de novo review, applying the usual tools of statutory interpretation. *Cf. District of Columbia Office of Human Rights v. District of Columbia Dep't of Corr.,* 40 A.3d 917, 925 (D.C.2012) (noting that agency's reasoning, though "very summary," considered statutory and regulatory language and structure). " 'The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language he has used.' " *Tippett v. Daly,* 10 A.3d 1123, 1126 (D.C.2010) (en banc) (quoting *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc)). As we have often stated, "[w]e must first look at the language of the statute by itself to see if the language is plain and admits of no more than one meaning." *Davis v. United States,* 397 A.2d 951, 956 (D.C.1979). " 'The literal words of a statute, however, are not the sole index to legislative intent, but rather, are to be read in light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice.' " *District of Columbia v. Bender,* 906 A.2d 277, 281 (D.C.2006) (quoting *Jeffrey v. United States,* 892 A.2d 1122, 1128 (D.C.2006)). Statutory interpretation is, in other words, a " 'holistic endeavor,' " *Washington Gas Light Co. v. Pub. Serv. Comm'n,* 982 A.2d 691, 716 (D.C.2009) (quoting *Cook v. Edgewood Mgmt. Corp.,* 825 A.2d 939, 946 (D.C. 2003)), in which we must " 'consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme.' " *Tippett,* 10 A.3d at 1127 (quoting *Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)); *see In re T. L. J.,* 413 A.2d 154, 158 (D.C.1980) (" '[W]henever possible, a statute should be interpreted as a harmonious whole.' " (quoting *United States v. Firestone Tire & Rubber Co.,* 455 F.Supp. 1072, 1079 (D.D.C.1978))). For that reason, we should avoid construing a statute at odds with the legislature's purpose. *District of Columbia v. Beretta U.S.A. Corp.,* 940 A.2d 163, 171 (D.C.2008).

Both parties argue that the statutory language is plain and unambiguous. The difference between the parties is that Appleseed urges us to examine the text of the entire statute, including the community reinvestment mandate in § 31–3505.01, while GHMSI encourages us to focus on the language of § 31–3506(e) and, even more specifically, the use of the conjunctive word "and" in subsection (2): "After a hearing, the Commissioner determines that the surplus is unreasonably large *and* inconsistent with the Corporation's obligation under" § 31–3505.01 (emphasis added). See page 9, *supra.* As we now explain, such an isolated reading of this one subsection presents an incomplete—and therefore incorrect—interpretation of legislative intent. In examining the statute, it is apparent that both § 31–3506(e)(2) and § 31–3505.01, are designed to effectuate the same overall purpose. One section requires GHMSI to "engage in community health reinvestment to the maximum feasible extent *consistent with* financial soundness and efficiency." D.C.Code § 31–3505.01 (emphasis added). In a corresponding provision, for a surplus to be considered excessive, the MIEAA requires the Commissioner to determine that the

[an] unreasonably large surplus, then the second part [the community health reinvestment] doesn't come into play."

surplus is "unreasonably large" *and inconsistent with* the corporation's obligation" under Section 6(a). D.C.Code § 31–3506(e)(2) (emphasis added). Both sections were adopted as part of the MIEAA. The two sections are not only interrelated, but mirror each other and, in the case of § 31–3506(e)(2), explicitly cross-references GHMSI's obligations to reinvest in community health as an integral part of the determination whether a surplus is "excessive." As circular and inartful as this formulation may appear, it strongly indicates the Council's twin objectives in amending the statute: (1) obligating GHMSI to reinvest in community health "to the maximum feasible extent," (2) without undermining GHMSI's "financial soundness and efficiency." A harmonious interpretation of the statute's language, viewed in its entirety, requires that a surplus determination hearing under § 31–3506(e)(2) keep both objectives in mind. In other words, the Commissioner cannot determine whether the surplus is unreasonably large under the statute without taking account of the corporation's statutory obligation to engage in community health investment. The reinvestment mandate is a crucial factor in judging whether a surplus is "unreasonably large" for purposes of the MIEAA.

▪ Although we think the language of the MIEAA is sufficiently clear to demonstrate the Council's intent, "in certain circumstances it is appropriate to look beyond even the plain and unambiguous language of a statute to understand the legislative intent." *District of Columbia v. Cato Inst.,* 829 A.2d 237, 240 (D.C.2003). Here, the legislative history supports that the community health reinvestment obligation created by § 31–3505.01, was the primary motivation behind the MIEAA. The purpose of the legislation, as stated in the Committee Report, was "to provide a framework to ensure that nonprofit hospital and medical services corporations pursue their public health mission." Report on Bill 17–934, *supra,* at 2. In reciting GHMSI's "history of straying from its public health mission," the Council noted "a lack of ... accountability to [GHMSI's] mission," and sought to establish a "framework for GHMSI to meet its public health mission." *Amicus curiae,* Councilmember Mary M. Cheh, who was the principal author of the legislation, elaborated in a public hearing of the Committee on Public Service and Consumer Affairs on October 10, 2008:

> [The bill] establishes a framework, with all due consideration for [GHMSI's] financial soundness and efficiency, to settle this question of community health care benefits. Of course this Committee, this Council, wants [GHMSI] to remain a robust and prosperous participant in the District's health insurance market. But there is a real need for accountability, and I think this legislation will fill that need.

Moreover, modifications to the original legislation show that the "unreasonably large" language was a late addition to the statutory scheme. As initially drafted, the statute would have created "a presumption that a corporation operating at a surplus level greater than the upper level of the sufficient operating surplus range is not engaging in community health reinvestment to the maximum feasible extent consistent with financial soundness and efficiency."[36] D.C. Bill

36. The presumption could be rebutted "only by the corporation's demonstration to the Mayor ... that the corporation's operation at a surplus level greater than the upper level of the sufficient operating surplus range set by the Mayor is appropriate under the circumstances, taking into account that the corpora-

17–934 § 2(d) (as introduced Sept. 16, 2008). In response to concerns from Maryland officials, however, the Council eliminated the presumption in favor of language from the corresponding Maryland statute, which contained only the "unreasonably large" formulation.[37] *See* D.C. Bill 17–934 § 2(d) (as engrossed). When the final legislation was enacted by the Council, however, it included the "unreasonably large" language from the Maryland statute *and* kept the "maximum feasible extent" requirement from the initial Council draft, with the specific cross-reference to that mandate we have discussed in the provision charging the Commissioner to determine whether a corporation's surplus is "excessive." D.C. Act 17–704 §§ 2(c) & (d), 56 D.C.Reg. at 1347, D.C.Code §§ 31–3505.01 & 31–3506(e). The legislative history and the Council's alterations of the MIEAA during the drafting process reinforce our reading of the statute's language that the Act was designed primarily to enforce the obligation of the corporation to reinvest in community health to the maximum extent consistent with its financial soundness.

Viewing the language of the statute as a whole, and considering its legislative history and purpose, we hold that, as a matter of law, the two determinations required by § 31–3506(e)(2)—whether GHMSI's surplus is "unreasonably large" and whether the surplus is "inconsistent" with GHMSI's community health reinvestment obligations under § 31–3505.01—must be made in tandem, not *seriatim*, to give full effect to the statute. Because in applying the statute,

the Commissioner divorced these two determinations and focused first—and exclusively—on whether the surplus was "unreasonably large," we conclude that the Commissioner's interpretation is not faithful to the statute's language, overall structure, and purpose. However, we recognize that, beyond the essential requirement that the Commissioner's "unreasonably large" determination must consider the mandate to reinvest in the community to the "maximum extent feasible" consistent with financial soundness, there remain details as to how such a determination is to be made. As to the specification of how surplus and community reinvestment are to be calculated and balanced, we defer to the agency's reasonable discretion in light of its expertise in this subject matter. We, therefore, remand the case to the Department for an express interpretation of the MIEAA that captures all the relevant provisions, in light of the statute's legislative purpose. *Cf. District of Columbia Office of Human Rights,* 40 A.3d at 928 (noting that "special competence of the agency was not required" before engaging in de novo judicial review of regulations).

### V. Decision on the Merits

 Appleseed also challenges the merits of the Commissioner's decision on the ground that the order failed to provide a rational explanation to support the finding that a RBC–ACL ratio of 850% was the appropriate maximum surplus level for GHMSI in 2008. GHMSI counters that the Commissioner made "cogent findings" on each issue and that the order is sup-

---

tion has a community health reinvestment obligation." D.C. Bill 17–934 § 2(d).

**37.** *See* Md.Code Ann., Ins. § 14–117(e) (2010):

(1) The surplus of a corporation authorized under this subtitle may be considered to be excessive only if:

(i) the surplus is greater than the appropriate risk based capital requirements as determined by the Commissioner for the immediately preceding calendar year; and
(ii) after a hearing, the Commissioner determines that the surplus is unreasonably large.

**1216**

ported by substantial evidence on the record.

### A. Standard of Review

Our review of the Commissioner's order is governed by the DCAPA. *See* D.C.Code § 2–510(a)(3). In reviewing the decision, " 'we will affirm the ruling unless it is arbitrary, capricious, or otherwise an abuse of discretion and not in accordance with the law.' " *Washington Metro. Area Transit Auth.*, 992 A.2d at 1280 (quoting *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 926 A.2d 140, 147 (D.C.2007)). The Commissioner must make factual findings on all material contested issues, the findings must be supported by substantial evidence on the record, and the conclusions must rationally flow from the findings. *See Mills v. District of Columbia Dep't of Emp't Servs.*, 838 A.2d 325, 328 (D.C.2003). "Substantial evidence is 'relevant evidence such as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Black v. District of Columbia Dep't of Emp't Servs.*, 801 A.2d 983, 985 (D.C.2002)). In addition, the order must "state the basis of its ruling in 'sufficient detail' " so that the parties may have a basis on which to decide whether to seek judicial review. *Office of People's Counsel v. Pub. Serv. Comm'n*, 21 A.3d 985, 996 (D.C.2011) (quoting *Winkler v. Ballard*, 63 A.2d 660, 662 (D.C.1948)). The requirement that the decision be fully and clearly explained also is necessary for meaningful judicial review of and deference to the agency's decision. *Id.* at 996 n. 22 ("Explanation in sufficient detail also is required for meaningful judicial review and for there to be a basis for judicial deference to agency determinations.").

### B. The Commissioner's Findings

GHMSI contends that the Commissioner's findings were sufficiently supported by evidence in the record. While this may be so, it does not obviate the focus of our review on whether the order adequately explains the Commissioner's reasoning in making the findings. *Cf. Eagle Maint. Servs., Inc. v. District of Columbia Contract Appeals Bd.*, 893 A.2d 569, 580 (D.C. 2006) ("The substantial evidence test is satisfied only when an administrative agency 'fully and clearly explains its decision'...." (quoting *Office of People's Counsel v. Public Service Com'n of District of Columbia*, 797 A.2d 719, 726 (D.C. 2002))). For guidance on this point, we look to the Supreme Court and the Court of Appeals for the District of Columbia Circuit.

In *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained the rationale behind requiring an administrative agency to adequately explain its decision-making process:

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

332 U.S. at 196–97, 67 S.Ct. 1575 (quoting *United States v. Chicago, M., St. P., & P.R. Co.*, 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023 (1935)). The District of Columbia Circuit has similarly reasoned: "[b]y requiring the [agency] to explain its decisions fully and rationally, we can 'be confident that missing facts, gross flaws in agency reasoning, and statutorily irrele-

vant or prohibited policy judgments will come to a reviewing court's attention.'" *Great Lakes Gas Transmission Ltd. P'ship v. F.E.R.C.*, 984 F.2d 426, 432 (D.C.Cir.1993) (quoting *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 593 (D.C.Cir.1979)). The more technical and complex the subject matter, the more explanation the agency ought to provide for its decision. *See NetCoalition v. SEC*, 615 F.3d 525, 539 (D.C.Cir.2010) ("While 'we have long held that agency determinations based upon highly complex and technical matters are entitled to great deference,' *Domestic Sec., Inc. v. S.E.C.*, 333 F.3d 239, 248 (D.C.Cir.2003), ... 'we do not defer to the agency's conclusory or unsupported suppositions.'" (quoting *McDonnell Douglas Corp. v. United States Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C.Cir.2004))).[38] A perfect explanation is not required, and courts will "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). However, as we have recently emphasized, without sufficient findings and explanation from the agency, "we are unable to affirm ... that the [agency's] determination flowed rationally from the factual findings, and that the [agency] in fact applied the law taking into account the entirety of the record." *Jones v. District of Columbia Dep't Emp't Servs.*, 41 A.3d 1219, 1226 (D.C.2012).

In this case, Appleseed challenges four factors in the Commissioner's order: (1) the use of the BCBSA 375% RBC–ACL ratio threshold in calculating the appropriate surplus level; (2) the reliance on an "overlap" among four actuarial reports in determining the appropriate maximum surplus; (3) the failure to consider the surplus of other comparable insurers; and (4) the exclusion of the ARM actuarial report that Appleseed presented. Appleseed contends that the Commission "failed to explain the choices it made" in each of these four areas.

In the final decision and order, the Commissioner referred to the need that the 2008 surplus be sufficient to ensure (at "an extremely high level of likelihood") that GHMSI would stay above the 200% RBC–ACL level to avoid "a statutory action level event." The Commissioner also determined that the surplus must suffice to keep GHMSI above the 375% RBC–ACL ratio threshold with "a very high, but not extremely high, degree of likelihood."[39] Using these ratios as a baseline, the Commissioner noted there was "significant overlap" in the surplus levels recommended by four different actuarial studies to accomplish those objectives, and concluded that an 850% RBC–ACL ratio was the appropriate surplus level for GHMSI. Because GHMSI's $867 million surplus as of the end of 2008 corresponded to a RBC–ACL ratio of 845%, the Commissioner decided that it was not "unreasonably large."

In principle, we see no error in the Commissioner's use of the 200% and 375%

---

**38.** *See also Sierra Club v. Costle*, 657 F.2d 298, 333 (D.C.Cir.1981) ("[T]he agency must sufficiently explain the assumptions and methodology used in preparing the model.... The technical complexity of the analysis does not relieve the agency of the burden to consider all relevant factors and to identify the stepping stones to its final decision.").

**39.** The Commissioner stated that "other benchmarks could be considered for use in surplus reviews as of subsequent year-end periods that are performed when the impact of health care reform is more certain."

RBC–ACL ratio thresholds employed, respectively, by NAIC and BCBSA, as part of the analysis.[40] The Commissioner adopted the recommendation that a surplus with a ratio of 850% RBC–ACL would ensure "an extremely high degree of likelihood"—98–99%—of not falling below the statutory 200% RBC–ACL threshold, and a "very high, but not extremely high, degree of likelihood"—95%—of not falling below the BCBSA's 375% RBC–ACL threshold. Only one of these, the 200% threshold, however, has specific regulatory consequences under D.C. law. *See* D.C.Code § 31–3851.03(b)–(c). The 375% threshold, on the other hand, is a private marker that could trigger greater BCBSA monitoring of GHMSI and require more reporting by GHMSI. There is no explanation why the Commissioner thought it was necessary to have such high confidence levels for these thresholds, or why a 4% spread in confidence level was appropriate in light of their different sources and consequences.[41] Even if we knew the Commissioner's rationale on these points, however, it would necessarily be incomplete in light of our conclusion, discussed *supra*, that a proper surplus determination under the MIEAA requires simultaneous consideration of the requirement to engage in community reinvestment to the "maximum feasible extent" consistent with "financial soundness and efficiency." D.C.Code § 31–3505.01. Because the Commissioner did not take into account the obligation to engage in community reinvestment in determining whether GHMSI's surplus was "unreasonably

**40.** As already discussed *supra*, the 200% RBC–ACL ratio is codified in D.C. law. The Department's regulations implementing the MIEAA explicitly require the Commissioner to consider "the Blue Cross/Blue Shield Association capital requirements" in determining whether an insurer's surplus is "unreasonably large." See note 34 *supra*.

**41.** The lack of detailed explanation in this abbreviated (2–page) section of the order is compounded by the Commissioner's reliance on "overlap" among the various reports' recommendations, which could have been a coincidental commonality among actuarial reports, rather than on a reasoned analysis of the reports' conclusions based on each one's assumptions and methodologies—some of which the Commissioner appears to have found wanting. For example, the Commissioner noted that "it is not clear what methodology and assumptions Lewin used in its analysis" to establish a range of RBC–ACL ratios at various confidence levels. Similarly, the Commissioner commented that "[a]lthough Invotex indicated that it relied on the Milliman methodology for its analysis, it is not clear how the assumptions made by Invotex resulted in its range."

Appleseed's surplus recommendations were lower than the "overlap" ranges recommended by Milliman, Lewin, Invotex and Rector. The Commissioner explained that it would not consider ARM's report submitted by Appleseed because "the methodology [ARM] employed is unclear, and ARM lacked all the necessary data from GHMSI." An agency, as finder of fact, may "credit the evidence on which it relied to the detriment of conflicting evidence." *Metro. Poultry v. District of Columbia Dep't of Emp't Servs.*, 706 A.2d 33, 35 (D.C.1998). That choice implies the reasoned exercise of discretion and may not be made arbitrarily, however. As we are remanding the case for a redetermination of GHMSI's surplus and further explanation in light of the appropriate statutory criteria, we need not decide whether the Commissioner's decision to reject ARM's report because its methodology was "unclear" can be upheld. We do note that, as mentioned above, the Commissioner was also puzzled by the methodology of the reports on which the surplus determination did rely. Moreover, to the extent that the report was rejected because ARM "lacked all the necessary data from GHMSI," the Commissioner has a role to play in ensuring that the proceedings are fair to all participants and that the regulated entity discloses information (subject to appropriate agreements and limitations on use) necessary to the development of analyses by participants that contribute to the Commissioner's determination.

high," no consideration has been given to calibrating the level of confidence in each of the thresholds accordingly.[42] In addition, we note, the Commissioner's overriding concern appears to have been with financial "soundness," without any discussion of the statute's equal focus on "efficiency."[43] *Id.* (imposing obligation to "engage in community health reinvestment to the maximum feasible extent consistent with financial soundness and *efficiency* ") (emphasis added).

In short, the order leaves us with significant unanswered questions that effectively hinder our appellate review of the Commissioner's decision regarding GHMSI's surplus. We cannot affirm such a truncated and conclusory explanation, especially where, as here, the technical nature of the actuarial reports requires a far more detailed discussion of a decision in which even a small variance can implicate millions of dollars. *See Dickson v. Secretary of Defense,* 68 F.3d 1396, 1407 (D.C.Cir. 1995); *Winkler,* 63 A.2d at 662. More fundamentally, the order cannot be sustained on the merits because it is not based on a correct understanding of the statute.

## VI. Hearing on GHMSI's Future Surplus

 Finally, Appleseed contends that the Commissioner abused discretion in or-

dering that a review of GHMSI's 2009 and 2010 surpluses not occur until July 31, 2012, rather than ordering it to take place immediately. GHMSI responds that Appleseed mischaracterizes the Commissioner's order, and that the order was not arbitrary or capricious. We agree that the order was within the scope of the Commissioner's authority.

We afford an administrative agency "wide latitude in making its discretionary decisions concerning the manner in which it will enforce its program." *Thomas v. District of Columbia Dep't of Emp't Servs.,* 547 A.2d 1034, 1038 (D.C.1988). Therefore, in reviewing the Commissioner's order with respect to the 2009 and 2010 surpluses, "we will affirm the ruling unless it is arbitrary, capricious, or otherwise an abuse of discretion and not in accordance with the law." *Washington Metro. Area Transit Auth.,* 992 A.2d at 1280.

The Commissioner's final decision and order recognized that a subsequent de novo review of GHMSI's surplus as of December 31, 2009, would be necessary because it exceeded the 850% RBC–ACL ratio that had been determined to be appropriate for 2008. *See* D.C. Act 17–704 § 2(d), 56 D.C.Reg. at 1347, D.C.Code § 31–3506(e). However, finding that "the

**42.** The various reports proposed different ranges of surplus amounts, expressed as RBC–ACL ratios, in order to maintain the desired 375% RBC–ACL ratio, depending on the level of certainty. These ranges were described as "appropriate" (Lewin and Invotex) or "optimal" (Milliman). These ranges did not take into account the obligation to reinvest in the community to the maximum extent feasible. The Commission's own expert, Rector, did not provide a range, or characterize the RBC–ACL ratios it determined as "acceptable" or "optimal" in light of this obligation.

**43.** In this regard, the Commissioner should explain why data reflecting that for-profit insurers maintain lower surpluses, presumably because they are exposed to different market pressures, are not indicative of more efficient operations that could be useful in evaluating GHMSI's finances. We do not mean to imply that they are the same or that the operations, finances and resources of one sector are automatically transferable to the other, but to point out that the statute's reference to "efficiency" adds another consideration to be taken into account in the Commissioner's determination of what constitutes an "unreasonably large" or "excessive" surplus.

conclusions drawn in the expert consultants' reports regarding GHMSI's December 31, 2008, surplus do not accurately reflect the current environment and financial obligations of GHMSI," the Commissioner ordered another review of GHMSI's future surpluses "by July 31, 2012, with the benefit of the ongoing implementation of the Federal Health Care Reform Act and the enactment and implementation of companion legislation in the District."

We discern no abuse of discretion in the Commissioner's deferral of further surplus reviews in light of the changing conditions identified in the order. Although Appleseed sought an immediate review under the statute because GHMSI's 2009 surplus exceeded the 850% RBC–ACL ratio threshold, the statute plainly does not require the Commissioner to do so.[44] *See* D.C.Code § 31–3506(e). Rather, the statute requires a surplus review once every three years. *Id.* As the Commissioner's final decision and order was issued on October 29, 2010, the subsequent review deadline as set by the Commissioner (July 31, 2012) is within the three-year period.[45] Thus, the Commissioner's refusal to engage in another surplus review immediately is not plainly in contravention of the law. Further, as all the actuarial experts agreed (except ARM), the new federal Affordable Care Act would have a significant impact on GHMSI's financial commitments and the amount of surplus the corporation would need to carry. Insofar as the models and methodology employed by the actuaries and the Commissioner to determine the appropriate level of surplus would change based upon these legal reforms, the Commissioner could prudently decide to reevaluate GHMSI's surplus after the effects of the new law on GHMSI's operations and finances would be better ascertained. We therefore conclude that, under the circumstances, the Commissioner's decision to conduct the next surplus review at the end of the mandatory three-year period was not clearly arbitrary or capricious.[46]

## VII. Conclusion

For the foregoing reasons, the decision and order of the Department of Insurance, Securities, and Banking is affirmed in part and reversed in part. We remand the case to the Department for further proceedings not inconsistent with this opinion, including: (1) an interpretation of the MIEAA, as guided by the Department's discretion and expertise, that follows the framework we have set out in this opinion with respect to the obligation to engage in community reinvestment to the "maximum feasible extent consistent with financial soundness and efficiency," and (2) application of the revised standard to a redeter-

---

**44.** When the Council enacted the MIEAA, it also amended the statute to explicitly allow the Commissioner to conduct a review once every three years rather than on an annual basis. See note 8 *supra*.

**45.** The July 31, 2012 date is also within three years from the dates of the surplus hearing, September 10 and 11, 2009.

**46.** The Supreme Court recently upheld Congress' authority to enact the Affordable Care Act. *See Nat'l Fed'n of Indep. Bus. v. Sebelius,* —— U.S. ——, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). The Act's various provisions are due to be phased in over a period of years.

*See id.* at 2580–81. As the Commissioner's order foresaw, the impact of implementation of the law is likely to be a significant component of a current review of GHMSI's surplus. Earlier this year, the current DISB Commissioner, William P. White, issued a "Notice of Intent" to conduct a hearing for a new review of GHMSI's surplus. *See* District of Columbia Department of Insurance, Securities and Banking, Notice of Hospital and Medical Services Corporation Surplus Review (Jan. 20, 2012), available at http://newsroom.dc.gov/show.aspx/agency/disr/section/2/release/22937/year/2012.

mination whether GHMSI's surplus is unreasonably large or excessive, with more complete explanation of the reasoning in support of the Commissioner's determination.[47]

*So ordered.*

---

**47.** Our opinion concerns only the question of how to determine whether surplus is "unreasonably large." We have not been presented with the question of how any excess surplus is to be reinvested, an issue on which there appear to be different views. See note 22 *supra.*